# DECLARATION OF VANNESS H. BOGARDUS, III

I, VANNESS H. BOGARDUS III, declare:  I reside in Grass Valley, Nevada County, California.  My mailing address is 10556 Combie Road, Suite 6222, Auburn, California 95602-8908.

## PROFESSIONAL QUALIFICATIONS

1.      I am a retired Los Angeles County Deputy Sheriff, having honorably served about 17 years as a deputy.  My professional qualifications include the following:  Three years active duty, Sergeant, United States Marine Corps (1967-1970 [honorable discharge]); Bachelor of Arts degree in Public Management and Administration (University of Redlands, 1977); January 1971, to May 1988, Los Angeles County Deputy Sheriff (Honor Cadet, August 1971); Certified as Staffelfuhrer (staff leader), under the standards of the Landespolizeischule fur Diensthundfuhrer, NRW (State Police Canine School), March, 1985.  In 1978, I became a member of the LA Sheriff's Department Special Weapons Team, more commonly known as SWAT.  In June 1980, I became the first of two pilot canine handlers for the Los Angeles County Sheriff's Department.  I served as a Los Angeles County Sheriff's Department canine handler and, on occasion, trainer for the Sheriff's Department from June 1980, to approximately November 1986.  I have trained numerous canine units for the Los Angeles County Sheriff's Department, and the police departments of such cities in California as Montebello, South Pasadena, Glendale, Pomona and Alhambra.  I have also provided training and instructions to the governments of Kuwait, Cyprus, Philippines and Costa Rica (to name a few) on the use of canines for explosive detection, drug detection, police patrol, canine assisted police tactical operations and forensic tracking.

2.      I rely upon my training, certified in accordance with the California Department of Justice's Peace Officer's Standards and Training, aka "POST."  POST sets minimum training standards for

peace officers in the State of California.  I hold basic, intermediate and advanced POST certificates.

3.      I also rely upon my combat experience as a Marine in Vietnam and my experience as a member of the Sheriff's Department SWAT team.  Both as a Marine and SWAT team member, I learned and understand "Rules of Engagement" and how to adjust the "Terms of an Engagement," doing what one should do to stay alive while accomplishing the objective of all good police officers – the preservation of life.  My training and life experience have provided me with improved insight into matters that I am asked to review, analyze or evaluate.  I have over three years (26,000 hours) of pre-law enforcement combat experience as a Marine Infantry Sergeant and counter-guerilla warfare specialist in Vietnam and an aggregate of over 52 years of overall experience in the matters that I may educate, train, instruct, teach, coach and testify about.

4.      Since my retirement from the Sheriff's Department, I have been employed as an advisor and trainer of police dogs and their handlers for use in police services by several municipalities and law enforcement agencies in Southern and Northern California including: the Los Angeles County Sheriff's Department, the Orange County Sheriff's Department, the San Bernardino County Sheriff's Department, the Kern County Sheriff's Department, the City of Los Angeles Housing Authority, the cities of Huntington Park, Monterey Park, Pomona, Glendale, Burbank and South Pasadena.  This includes patrol and narcotics detection training.  Training of the dog necessarily includes training of the prospective dog handler, a police officer, in the use of the dog. I have been an advisor to police agencies in Northern California on the use of police dogs for both patrol and narcotics detection to the Placer County Sheriff's Department, the El Dorado County Sheriff's Department, the Sacramento County Sheriff's Department, the Nevada County Sheriff's Department and the City of Auburn.

5.      I am a professor of administration of justice at Sierra College, Rocklin, California.  I am

primarily involved in police oriented small-arms instruction, with an emphasis in the legal, moral and ethical implications of firearms usage.  As a licensed range master, I regularly train law enforcement personnel, security industry and interested civilians in the practical aspects of hand gunnery, combat shotgun or high-powered rifle techniques. This specialized instruction necessarily includes presentations pertaining to advanced strategies of safety and sound tactics.

6.      I have testified on numerous occasions in state and federal courts as an expert in police practices, procedures and tactics (SWAT, etc.), use of force, firearms training and usage, police dog training and usage and the training of police officers as dog handlers, precision marksmen and special team members.

7.      My professional services are charged at $75.00 for in-office work, $150.00 for out-of-office work.  Testimony time in deposition or trial is charged at an hourly rate of $395.00.  When travel requires multiple days, my per diem rate is $895.00.  For testimony, whether in deposition or trial, I charge portal to portal and reasonable travel expenses.

8.      I have been retained by counsel for the plaintiff Olivia Danielle SLIGH to review material and render opinions pertinent to the 2:14 AM, Thursday, July 5, 2018 incident at 878 Omeara, Montgomery, Texas, involving defendant CITY OF CONROE PD, et al., Civil Action 4:20-cv-1417 (Jury Trial). Accordingly, in compliance with Federal Rule 26, I have affixed to this declaration Exhibit A, disclosures of my activities in similar matters during the last four years and Exhibit B, my current professional resume.

## **MATERIALS RELIED UPON**

To render my preliminary opinions regarding the Thursday, July 5, 2018 incident, where plaintiff Olivia Sligh was assaulted and seriously bitten by a Conroe PD dog handled by Officer Tyson Sutton, I have reviewed the following material:

A.      Conroe Police Department Incident Report 18070144, by Officer Tyson Sutton dated Thursday, July 5, 2018 re: K9 search for Olivia Danielle Sligh, (6 pages), *cross reference to* Montgomery County Sheriff's Office Incident Report 18A181435, by Deputy Alex Montes dated Thursday, July 5, 2018 re: Assault on a police officer (8 pages).

B.      Conroe Police Department, General Order 8-21, Mentally Ill Persons, effective November 19, 2001, (2 pages).

C.      Conroe Police Department, General Order 5-01, Use of Force, effective January 2, 2018, (7 pages).

D.      Conroe Police Department, General Order 8-31, K9 Units, effective November 19, 2001, (4 pages).

E.      Nine color-copy incident photos, (9 pages) and 42 minutes 32 seconds Officer Sutton bodycam video.

F.      Texas Commission on Law Enforcement, Personnel Status Report of Tyson T. Sutton, TCOLE ID: 320930, (8 pages).

G.      Conroe Police Department, Deployment Reports Packet, re: Handler/dog Team Tyson Sutton and K9 Thor, dated November 20, 2016 through July 5, 2018, (167 pages).

H.      Harris County Sheriff's Office, Canine Utilization Field Notes Forms, re: Handler/dog Team Tyson Sutton and K9 Thor, dated October 29, 2015 through November 20, 2016, (120 pages).

I.      Conroe Police Department, K9 Training Reports, re: Handler/dog Team Tyson Sutton and K9 Thor dated June 6, 2017 through November 13, 2018, (219 pages).

I.      Conroe Police Department, K9 Training Reports, re: Handler/dog Team Tyson

Sutton and K9 Thor dated November 13, 2018 through January 1, 2020, (201 pages).

I.      Conroe Police Department, K9 Training Reports, re: Handler/dog Team Tyson

Sutton and K9 Thor dated January 20, 2020 through January 28, 2020, (220 pages).

J.      International Association of Chiefs of Police (IACP) Law Enforcement Policy

Center: Patrol Canines, Concepts and Issues Paper, Originally Published: May 1992,

Revised: September 2001, May 2015, (15 pages).

K.      IACP Model Policy: Patrol Canines, Effective Date: May 2015, (5 pages).

L.      Police Executive Research Forum (PERF), Critical Issues on Policing Series:

Guiding Principles on Use of Force, March 2016 (128 pages).

M.      National Consensus Policy and Discussion Paper, a collaborative effort, produced

October 2017 by 11 significant law enforcement leadership and labor organizations in the

United States: Use of Force, (15 pages):

## OPINIONS

9.      My incident opinions are:

A.       The police use of force and dog bites suffered by Ms. Sligh on July 5, 2018 were

a direct result of the policies, practices, training and customs permitted by the City of

Conroe Police Department (CPD).

1.      The CPD was deliberately indifferent to the substantial risk that its policies

were inadequate to prevent the catastrophic consequences of its failure to train and

supervise its officers in 1) the proper warnings and advisements given to citizens,

especially when taking them into custody "for their own safety," 2) deployment and

use of their attack-trained dog against non-criminal suspects and 3) the immediate

escalation of force to produce serious bodily injury to a Montgomery County citizen

expressing suicidal ideation and experiencing an urgent bleeding emergency.

2.      The failure of the City of Conroe to adequately train its police officers about the inherent risk of causing serious injuries with their "find & bite" attack-trained dog directly caused the resulting deprivation of Ms. Slighs's rights and protections under state and federal law.

3.      The failure of the City of Conroe to adequately train and supervise its police officers is the primary cause of the police-made emergency that unnecessarily inflicted serious dog biting injuries to Ms. Sligh, thus delaying emergency medical treatment.

B.      The CPD dog bites suffered by Ms. Sligh on July 5, 2018 were unreasonable, unnecessary and excessive force.  The ordered application of a 1) "find & bite" trained dog to, 2) "bite & hold," 3) "bite with a full-mouth" and 4) "bite until passive" did not comport with generally accepted standards governing the use of physical force in law enforcement.

C.      Dog handler Officer Sutton ordered his "find & bite" trained dog to bite an unarmed, non-threatening citizen expressing suicidal ideation and suffering from a cut carotid artery, an injury requiring emergency medical attention. The release of an attack trained dog where there was a risk to assisting officers and other potentially innocent third parties being bitten, was tactically dangerous and calculated to expose not only himself, but those other officers and the general public to the unnecessary risk of sustaining serious bodily injury or death.  Even under the CPD version of the events, it is my opinion that the use of unreasonable, unnecessary and excessive force under these circumstances was intentional and exercised with deliberate and reckless disregard for the safety and well-being of other officers and Ms. Sligh's life.

D.     Officer Sutton did not report the issuance of a K9 warning in advance of his forensic track for Ms. Sligh. When practical, the infliction of injuring force requires that suspects be warned *before* any force is used so that they can be afforded an opportunity to submit to the authority of the officers. If a suspect is compliant or surrenders to an officer's orders, no use of physical force is necessary, nor can any use of physical force greater than a firm grip be justified.

E.     It is generally accepted in law enforcement that before an officer uses physical force, classified in the "injuring/intermediate force" category, and that force creates a substantial risk of injury, the officer should warn the suspect, if feasible. The warning should advise the suspect of the intended use of force and the probable consequence ("stop or I'll shoot"; "come out or else I'll release the dog and you may be bitten"). See, for example, *Vathekan v. Prince George's County*, 154 F.3d 173, 179 (4th Cir. 1998) (holding that failure of police dog handler to give warning before letting dog bite violates the Fourth Amendment); *Deorle v. Rutherford*, 272 F.3d 1272, 1283-84 (9th Cir. 2001) ("Appropriate warnings comport with actual police practice.") and *Casey v. Federal Heights*, 509 F. 3d 1278 (10th Cir. 2007) (holding that the presence of an adequate warning and opportunity to comply voluntarily is crucial).

1.     CPD policy was inadequate on July 5, 2018 to offer Officer Sutton deployment guidance before releasing his dog to seriously bite Ms. Sligh, a young woman suffering suicidal ideation and a self-inflicted cut carotid artery, a serious medical emergency by any estimation. See for example *K9 Units, CPD General Order 8-31, 2.B.4. "A verbal warning or announcement will be given prior to all building searches, identifying the Police Department and that a trained police K9*

*will be released into the building if the person(s) inside do not surrender."*

    a.    Assumed within the CPD K9 Unit policy is the fact that the handler/dog team is responding to a call to search for hidden criminal trespass or burglary suspects *inside* of a building.

    b.    The CPD K9 Unit policy is otherwise silent with respect to requirements for announcements *outside* of buildings (*i.e. Requirements for clearly audible warnings or announcements given in the case of other than building searches, such as 1) prior to area searches, forensic tracking, fresh pursuits or handler-defense, 2) including reasonable opportunities to surrender and 3) the possible consequences for a failure to surrender.*).

2.    Upon locating Ms. Sligh, Officer Sutton reported, "I told her do not walk toward me. Do not walk toward me. The dog will bite you." This threatening utterance was not a proper K9 warning in conformance with CPD policy, such as it was, or with the law *(Ref. Texas Penal Code, Title 5, Section 22.07.  Terrorist Threat. (a) A person commits an offense if he threatens to commit any offense involving violence to any person or property with intent to: (2) place any person in fear of imminent serious bodily injury.).* The video evidence and Officer Sutton's report show that this was not a situation where he was prevented from giving a warning because he was under direct attack by a physically imposing Ms. Sligh and he was unable to say anything.

3.    Officer Sutton clearly had enough time to issue a proper canine warning, assure himself that Ms. Sligh heard the warning and had a reasonable amount of time to respond. Officer Sutton had enough time to exercise control of his dog and

withdraw far enough to allow Deputy Montes to make the initial contact. Ms. Sligh would have complied with a canine warning if that was really possible. She had no reason not to comply. However, under the circumstances of the 2:45 AM MCSO call for K9 tracking assistance, Ms. Sligh, was not reported to be armed, not reported to have threatened anyone and not reported to have assaulted anyone. In view of the initial Montgomery County Sheriff's Office call for K9 assistance and Officer Sutton's report, Ms. Sligh was not sought as a criminal suspect, rather as the subject of a mental health well-being search. MCSO Sergeant Fluellen and Deputy Montes thought she was a danger to herself.

4.      CPD policy was inadequate on July 5, 2018 to offer Officer Sutton deployment guidance before releasing his dog to seriously bite Ms. Sligh. Based upon the material reviewed so far, there is no evidence of a CPD policy authorizing any use of force whatsoever against anyone other than a criminal suspect. With that in mind, Officer Sutton reported, "I kept Thor as close to me as possible as up to this point, the female had committed no crime other than being a danger to herself."

F.      On July 5, 2018, the CPD Use of Force policy was divided between two primary categories. The first was *General Order 501, 3.A. Deadly Force: "Any use of force against a person that is likely to cause death or serious bodily injury."* The second was *3.B. Use of Force: Any use of force against a person other than that which is considered deadly force."* Based upon the two CPD Use of Force policy definitions, I conclude that under CPD General Order 501, 3.A. Officer Sutton intentionally released his dog to bite and seriously injure Ms. Sligh, a non-criminal suspect, in specific violation of the following CPD policy provisions:

1.      *CPD Use of Force General Order 501, C.2. Parameters for Use of Force: Officers shall use only the minimal amount of force necessary to accomplish their police mission. The use of excessive force is strictly forbidden."*

2.      *CPD Use of Force General Order 501, E.2. Protections of Persons, Their Rights and Their Property: All employees shall protect the rights of all persons whether in custody nor not and shall not in any way interfere with those rights; nor shall any officer verbally abuse or use any unnecessary use of force against any person."*

G.      The CPD Use of Force Policy addresses the authorized use of physical force to effect an arrest, prevent escape, or overcome resistance.  Clearly the standard is addressing the use of force with actively resisting criminal suspects. Any use of force otherwise would potentially subject innocent citizens, be they patient subjects, as was Ms. Sligh, witnesses, victims, or uninvolved third parties to unreasonable searches and seizures in violation of the protections afforded under the 4th Amendment.

H.      Generally, the police use of force policies in the United States have not changed for decades. In my opinion, because the CPD condoned the unlawful actions of Officer Sutton's escalation of force sufficient to produce serious bodily injury against Ms. Sligh and has not changed their policy, they knowingly retain an unwritten policy of tolerating the routine use of force sufficient to produce serious bodily injury against non-threatening and non-resisting citizens, as referenced by the following:

1.      *Texas Penal Code, Title 5, Offenses Against the Person, Chapter 22.01. Assaultive Offenses: Assault, (a) A person commits an offense if the person: (1) intentionally, knowingly or recklessly causes bodily injury to another, including the*

10

*person's spouse, (2) intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse; or (3) intentionally or knowingly causes physical contact with the person knows or should reasonably believe that the other will regard contact as offensive or provocative.*

2.      *Texas Penal Code, Title 5, Offenses Against the Person, Chapter 22.02. Assaultive Offenses: Aggravated Assault, (a) a person commits an offense if the person commits an assault as defined in Sec. 22.01 and the person: (1) <u>causes serious bodily injury to another</u>, including the person's spouse; or (2) uses or exhibits a deadly weapon during the commission of the assault.*

3.      <u>*Note*</u>*: Under Texas law, the offense of an <u>Aggravated Assault is a felony of the first degree if committed by a public servant acting under color of the servant's office or employment</u> ((Ref. TPC Sec. 22.02. (b)(2)(A)).*

I.      To deflect culpability for an aggravated assault with his CPD "find & bite" attack-trained dog, Officer Sutton strained plausibility *(Ref. bodycam video evidence, starting at 10:55 through 13:36, contradicting Officer Sutton's and Deputy Montes' reports)* by generating a report portraying Ms. Sligh, as a felony assault suspect and Deputy Montes the victim, asserting that she, "…responded by striking Deputy Montes in the face multiple times with closed fists *(Ref. bodycam evidence, starting at 11:52 through 12:30 contradicting Officer Sutton's and Deputy Montes' reports. Deputy Montes is not seen being struck in the face multiple times by Ms. Sligh's closed fists.)* Deputy Montes disengaged Sligh for a moment but she continued to advance toward him *(Ref. bodycam evidence at 12:10 through 12:30, depicting Deputy Montes breaking contact and retreating enough to get out of Officer Sutton's dog's way. Ms. Sligh can be seen merely standing*

*there just before the dog bit her in the right thigh.)* At that time, I deployed K9 Thor to apprehend Sligh. K9 Thor apprehended Sligh by biting her on the right thigh *(Ref. bodycam evidence at 12:30 through 12:35 depicting the escalation to serious injuring force/aggravated assault dog biting against a non-threatening subject, already suffering a serious bleeding emergency from a cut to her carotid artery.)* This caused Sligh to crumble to the ground and she began to be unable to resist *(Ref. bodycam evidence at 12:33 through 13:36, 1 minute three seconds of horrific screaming and unprotected dog biting the soft flesh of Ms. Sligh's right thigh. There is no rational excuse to allow an attack-trained dog to bite a defenseless person, as is depicted in this video.).* As Montes gained the upper hand physically, *(Ref. bodycam evidence at 12:34 through 12:39 re: Sutton's commands, "On the ground! On the ground! Now!" Note that Ms. Sligh was already on the ground, screaming.").* I removed K9 Thor from his grip on Sligh's thigh *(Ref. bodycam evidence at 12:44/12:47/12:52/12:57 re: the dog was unresponsive to handler's bite release commands requiring that the dog had to be physically removed by Sutton. Also, at 13:19 note that Ms. Sligh pleads with Officer Sutton, "Get this dog off me!")* Although the majority of Sligh's body, was under control, her legs were still flailing wildly. As I attempted to step back and away from Sligh and Montes, Sligh's left foot came into range of K9 Thor and he also engaged there. I immediately released him off that grip and pulled him away from both subjects."

J.      After action, Officer Sutton submitted his incident report to Sergeant Ian Trotter. Unfortunately, Sergeant Trotter breached his primary duties as a CPD supervisor. Based upon his knowledge of the MCSO mutual aid call for a forensic track of a "female victim on foot who had cut her throat," Sergeant Trotter missed a critical opportunity by failing

to query Officer Sutton about the reason why he ignored CPD General Orders as reflected in *General Order 8-21, Mentally Ill Persons, Section 2. C. Incidents involving a mentally ill person require tactful, patient and understanding responses. The police officer on scene must be aware that his initial contact with a mentally ill person will have a strong influence on that person's immediate conduct and, perhaps on that person's ultimate prognosis as well. To the extent reasonably possible, an officer should:*

> *1.      Attempt to learn as much as possible about the individual and the situation, by talking with the mentally ill person, his family, his friends and witnesses.*

> *2. Regardless of the circumstances (e.g. verbal abuse directed at the officer), respond in an objective, unexcited, non-elusive, unthreatening manner in order to calm and control the subject.*

> *3. Not deceive the mentally ill person. Trust enhances the opportunity for controlling the situation.*

K.      As the video clearly reflected, Officer Sutton's track yielded the location of Ms. Sligh. His tracking mission objective was realized. He was of no help by risking that his would bite anyone. It should have been obvious that Sergeant Fluellen and Deputy Montes were fully capable to take over their initial attempted suicide and medical emergency call, without injury to anyone.

> 1.      Sergeant Trotter failed to challenge Officer Sutton over the fact that had he merely stepped aside, Ms. Sligh would not have been the victim of an aggravated assault by a CPD "find & bite" attack-trained dog.

> 2.      Sergeant Trotter failed to counsel Officer Sutton that, by allowing his "find & bite" attack-trained dog so close, he created an unnecessary "police made"

emergency by endangering Ms. Sligh and Deputy Montes, when he released his dog to bite. Bodycam evidence shows Deputy Montes was lucky that he too was not bitten.

L.    Sergeant Trotter compounded this supervisory failure by favorably endorsing the report up the CPD chain of command. See Sergeant Trotter's 5:54 AM, 07-05-2018 internal memo to Lieutenant Michael Dean, *"I was not on scene during this use of force incident. I obtained all knowledge from the primary officer involved. The information he provided justified his actions and met all of the departments guidelines and policies. I have uploaded Officer Sutton's BWC to Spillman. I watched the video and did not observe any policy violations and am not recommending any corrective action be taken. Photos of Suspect and injured Deputy attached to Blue Team."*

1.    As the supervising Sergeant, not being on scene during the use of force incident should have been the impetus to collect more information (i.e. MCSO calls and Deputy reports, witness statements, EMT reports, Intake-triage reports, medical treatment reports, etc.) to put the call into proper context *(i.e. Forming reliable opinions by analyzing the totality of the facts and circumstances, rather than making premature judgement calls based upon limited or assumed information.)* for further department analysis.

2.    Most importantly, it was Sergeant Trotter's responsibility to review Officer Sutton's report for form and the responsive link between Ms. Singh's actions and his escalation to the infliction of serious bodily injury by releasing a CPD "find & bite" attack-trained dog against a reported intoxicated, suicidal, severely bleeding woman that had not, according to Officer Sutton's report, committed any crime

other than being a danger to herself.

3.      Sergeant Trotter failed to remind Officer Sutton that his basic police training and the 4th Amendment provided limitations against the use of unreasonable force. Initial evidence indicated that Ms. Sligh was a young woman suffering from suicidal ideation and a self-inflicted cut carotid artery requiring emergency medical assistance. Her boyfriend had informed MCSO Sergeant Fluellen that "… she was also intoxicated.  The boyfriend described the injury to Singh's neck as severe and advised Fluellen that her bleeding was heavy."

4.      Sergeant Trotter failed to highlight his recognition of the extreme medical emergency unfolding as Officer Sutton reported, "…Fearing that Sligh could be injured to the extent that she could die if not found and treated, I deployed K9 Thor to assist in locating her." After observing a forest green shirt fitting with Ms. Sligh's description, Officer Sutton reported, "I then got on to MCSO channel 1 and advised them that I had found the female. As I waited for MCSO units to arrive at my location, I heard branches breaking and realized the female was fleeing further into the woods. Knowing that K9 Thor's olfactory ability would allow us to keep track of the female better than Officer's observations, I re-entered the woods to pursue the female. I kept Thor as close to me as possible as up to this point the female had committed no crime other than being a danger to herself."

5.      When Sergeant Trotter learned of the facts and circumstances surrounding the biting of Ms. Sligh by a "find & bite" attack-trained dog, he failed to ask Officer Sutton by what rationale do you continue to pursue and allow your dog to bite a 1) seriously injured 2) suicidal female that 3) had committed no crime, 4) other than

being a danger to herself – 5) once she was located? *(Note: This is a good example of why the find & bite doctrine of K9 deployment can be so problematic. The only explainable rational is that this is how Officer Sutton was trained to conclude his searches with his "find & bite" attack-trained dog.)* With the exception perhaps of a firm grip, Sergeant Trotter failed to counsel Officer Sutton that there is no provision in CPD policy or law to use any force whatsoever against non-threatening citizens.

6.      Sergeant Trotter sent a dishonest analysis to Lieutenant Dean and the chain of command by reporting, *"I have uploaded Officer Sutton's BWC to Spillman. I watched the video and did not observe any policy violations and am not recommending any corrective action be taken. Photos of Suspect and injured Deputy attached to Blue Team."*

7.      It was dishonest for Sergeant Trotter to report that he did not observe any policy violations, when clearly there were specific CPD policies on point governing the 1) Mentally Ill Persons, 2) Use of Force and 3) K9 Units.

8.      Sergeant Trotter failed in his responsibility to administratively relieve Officer Sutton from field duties in keeping with the provisions set forth in *"CPD Use of Force General Order 5-01, Section 2. Administrative review of critical incidents.*

    a.      *All incidents, whether reported by members of the department or the public, related to discharge of firearms (other than for training purposes), <u>unnecessary use of force</u> or <u>physical</u> or <u>verbal</u> <u>abuse</u> by members of the department shall be reviewed by appropriate authority and in compliance*

*with the administrative and criminal investigation procedures of the department.*

b. *Where an officer's <u>use of force results in serious injury to a person or is of such a nature as to require criminal investigative procedures to be initiated by the department</u>, the officer <u>shall</u>, at the discretion of the chief of police be placed on administrative leave or administrative assignment until such time as the criminal investigation is concluded and the officer has had an <u>individual counseling session</u> with a Department-assigned psychologist or psychiatrist, or as otherwise determined by the Chief of Police.*

M.     In turn, see Lieutenant Michael Dean's 5:02 AM, 07-10-2018 internal memo to Deputy Chief Lee Tipton, *"Use of Force for review. UOF justified. Sutton was using Thor to track for a suicidal subject for MCSO. Upon locating her, she was argumentative and assaulted a deputy. Sutton deployed Thor to stop the assault and detain the subject which was successful. No further action or recommendation needed for this incident."*

1.     Lieutenant Dean accepted Sergeant Trotter's endorsement at face value, restating the same analysis as reflected in paragraph L. above.

2.     Lieutenant Dean expands on Sergeant Trotter's endorsement by making several more false assumptions. A brief perusal of Officer Sutton's report should have clearly indicated that 1) Officer Sutton's "find & bite" attack-trained dog was capable of inflicting a serious biting injury to Ms. Sligh. 2) Ms. Sligh was a handler's "in-view" finding of a non-criminal, suicidal and severely bleeding subject. 3) Ms. Sligh was not given a proper K9 warning in conformance with policy and law. 4) Ms. Sligh was threatened by Officer Sutton, "Do not walk toward

me, do not walk toward me. The dog will bite you." 5) Officer Sutton failed to assist Deputy Montes by keeping his dog clear and offering his help in applying the handcuffs. 6) Officer Sutton permitted his dog to bite in retaliation *(aka: In police parlance, known as "Contempt of Cop.")* for purported verbal defiance – by a mentally and medically impaired person, 7) on a dubious claim that she was assaulting an MCSO Deputy. 8) It should have been obvious to Lieutenant Dean that it was a Deputy that applied the handcuffs and not the dog. 9) All the "find & bite" attack-trained dog could do under the circumstances was to bite and 10) make the situation more dangerous for everyone by inflicting more serious injuries to Ms. Sligh, a woman already suffering a life-endangering medical emergency.

N.     Finally, see Deputy Chief Lee Tipton's 10:42 AM, 07-17-2018 internal memo to Chief Jerry Christy, *"Officer Sutton and K9 Thor – MCSO assist – K9 deployment and apprehension. Officer Sutton assisted MCSO deputies with tracking a female who had apparently injured herself. Officer Sutton and K9 Thor found the female and waited for MCSO deputies to detain her. Officer Sutton gave the female commands to stop approaching him biting her. She refused and was belligerent towards Officer Sutton and MCSO deputies. One MCSO deputy tried to use empty hand control to take the female into custody and she physically resisted striking the deputy several times. Officer Sutton deployed the K9 only after the female assaulted a police officer. The K9 gained compliance from the female and she was taken into custody. Officer Sutton acted within department policy and only used his K9 partner when another officer was being physically assaulted. No further action or recommendation needed for this incident. Due to confined space the secondary bite was not the cause of officers on scene."*

1.      Deputy Chief Tipton accepted Lieutenant Dean and Sergeant Trotter's endorsements. However, he further expands on the false assumptions reported by Lieutenant Dean and Sergeant Trotter, as reflected in paragraphs L. and M. above.

2.      Deputy Chief Tipton embellishes Lieutenant Dean's and Sergeant Trotter's endorsements by 1) claiming that Ms. Sligh had "apparently injured herself." There was no "apparently" ever reported about Officer Sutton's call. 2) Once found, Ms. Sligh was approaching Officer Sutton. 3) Officer Sutton failed to give a proper K9 warning in conformance with policy and law. 4) Rather, he threatened Ms. Sligh twice to not come near the dog or it would bite. 5) Officer Sutton failed to keep his dog under control and assist Deputy Montes with empty-hand control and the application of handcuffs. 6) Officer Sutton permitted his dog to bite in retaliation for purported verbal defiance by a mentally and medically impaired person, on a dubious claim that she was assaulting an MCSO Deputy. 7) It was not the dog that gained compliance of Ms. Sligh, it was Deputy Montes. 8) It should have been obvious that it was a Deputy that applied the handcuffs and not the dog. 9) All the dog could do under the circumstances was to make the situation more dangerous for everyone and inflict more serious injuries to Ms. Sligh, already suffering a life-endangering medical emergency. 10) Officer Sutton was in violation of CPD policies and established law when he permitted his dog to bite Ms. Singh in such close proximity to Deputy Montes. 11) CPD policy calls for an investigation of excessive force cases. It was irresponsible as a CPD department executive to recommend no further action needed for this incident. 12) The secondary bite to Ms. Sligh's ankle was the result of Officer Sutton not adequately controlling his

overly aggressive dog away from the prolonged 1 minute 3 seconds biting *(Ref. Bodycam video starting at 10:55, Ms. Sligh's horrific screaming and pleas to, "Get this dog off me!").*

3.      In light of the compelling evidence of subordinate malpractice, Lieutenant Michael Dean, Deputy Chief Lee Tipton and Chief Jerry Christy failed in their responsibilities to do what most, if not all, competent police officers do on a daily basis, check the veracity of the information they are given. Their failure to check the veracity of the story they were given about their "find & bite" attack-trained dog under Incident 18070144, resolve the several obvious departures from CPD policy, law and sound police practice is astonishing.

O.      Not checking into the veracity or the plausibility of the information about his "find & bite" attack-trained dog contained in Officer Sutton's report with four supporting endorsements, Chief of Police Jerry Christy accepted the package at face value. Knowing the training and the expected outcomes of his "find & bite" attack-trained dogs, he did not require any further action.  He breached his duties as the Chief of Police by not calling for an immediate internal investigation of the 878 Omeara, Montgomery, TX incident, as provided by:

1.      "*CPD Use of Force Policy definition given in Section 5-01, 3. A. Deadly Force: Any use of force against a person that is likely to cause death or serious bodily injury.*" Minimally, the injury photos and the video evidence should have convinced him that a Ms. Sligh was the recipient of serious bodily injuries from the CPD dog bites on July 5, 2018.

2.      Invoking the provisions set forth in *"CPD Use of Force General Order 5-*

*01, Section 2. Administrative review of critical incidents.*

> *a.       All incidents, whether reported by members of the department or the public, related to discharge of firearms (other than for training purposes), <u>unnecessary use of force</u> or <u>physical</u> or <u>verbal</u> <u>abuse</u> by members of the department shall be reviewed by appropriate authority and in compliance with the administrative and criminal investigation procedures of the department.*

> *b.       Where an officer's <u>use of force results in serious injury to a person</u> or <u>is of such a nature as to require criminal investigative procedures to be initiated by the department</u>, the officer <u>shall</u>, at the discretion of the chief of police be placed on administrative leave or administrative assignment until such time as the criminal investigation is concluded and the officer has had an <u>individual counseling session</u> with a Department-assigned psychologist or psychiatrist, or as otherwise determined by the Chief of Police."*

3.       No one, including Chief Christy, admonished Officer Sutton that it was unlawful to use any force whatsoever, never mind permitting a CPD "find & bite" attack-trained dog to bite, against a non-threatening citizen. No one, including Chief Christy, informed Officer Sutton that they intended to investigate the incident to assure the enforcement of "*CPD Use of Force General Order 501, E.3. Protections of Persons, Their Rights and Their Property: No officer shall falsely arrest, imprison or direct any malicious prosecution against any person.*

4.       Knowing the dangers of his "find & bite" attack-trained dogs, Chief Christy failed to provide adequate training and supervision of Officer Sutton, his dog and

his chain of command. In my opinion, the Chief of Police and the Mayor of the City of Conroe share in culpability for this malfeasance.

M.     Ms. Sligh retained the right of self-defense against the unreasonable, unnecessary and excessive actions of the CPD on July 5, 2018. Ironically, had she been armed *(fortunately she was not),* Ms. Sligh would have been justified to resort to deadly force to control a dangerous animal released by his handler to repeatedly bite her on the right thigh and ankle. After all, police officers across the country frequently shoot large aggressive dogs that threaten them. Those shootings are upheld by their respective agencies too.

1.     The unfortunate consequence of shooting an over-aggressive police dog in the presence of his police officer owners would, no doubt, be perceived as a threat to their safety. Those officers might assume that they too are the targets of the gunfire and would, no doubt, exercise their right to self-defense and return gunfire. Either way, by provoking a gunfight, Ms. Sligh, the officers and the general public would not benefit by exercising her right to defend herself from the excessive force of the 42 teeth of the CPD "find & bite" attack-trained dog.

2.     As written, the CPD Canine Policy is vague and fails to offer adequate guidance to dog-handlers to prevent issues of unwarranted K-9 aggression and unreasonable, unnecessary and excessive use of force in the form of dog biting. Of the 17 potential situations where the use of a CPD dog is authorized, there is no prohibition for a CPD dog to bite a non-suspect, as in the instant case, a woman expressing suicidal ideation and suffering profuse bleeding from a self-inflicted cut to her carotid artery – a serious medical emergency.

3.     *CPD General Order 8-31, K9 Units Policy, Section 2.B.12. The canine may*

*be released off leash to apprehend any suspect evading arrest that is known to be armed, has demonstrated violence or the potential for violence or has committed a felony offense. A verbal command to stop or the canine will be released should be given first."* highlights the core problem with the K9 Unit policy. The Chief of Police has effectively created a double standard by relinquishing the command and control of his "find & bite" attack-trained dogs to his line-level dog handling police officers. Unlike police officers without dogs, the dog handling officers are excused from use of force standards when permitting their "find & bite" attack-trained dogs to bite <u>anyone</u> (*i.e. See 1)* <u>any</u> *suspect evading arrest, 2) known to be armed, 3) has demonstrated violence, or 4) the potential for violence, or 5) has committed a felony offense.).*

4.     The instant case involves a CPD "find & bite" attack-trained dog. The case was reported and subsequently analyzed as a use of force. Under *CPD General Order 5-01, Use of Force, D. Training and Qualifications, 2. Intermediate Weapons, a. Police Officers are not permitted to use an intermediate weapon unless qualified in its proficient use as determined by training procedures. b. The following intermediate weapons are authorized: straight baton, riot baton (4'), Asp baton, PR-24, O.C. pepper mace, tear-gas (CS/CN), Taser, specialized cartridges (i.e. bean bag rounds, rubber pellets, etc.).* However, CPD General Order 5-01 is silent with respect to the authorized use of attack-trained dogs to bite anyone. The CPD Use of Force policy does not even mention or allude to the word "dog," "canine," "K9" or "K9 Unit."

5.     On point, the Chief of Police has not considered K9 case law. See <u>Chew v.</u>

Gates, 27F.3d 1432 (9th Cir. (Cal) June 27, 1994), "Where the city equips its police officers with potentially dangerous animals, and evidence is adduced that those animals inflict injury in a significant percentage of the cases in which they are used, a failure to adopt a departmental policy governing their use or to implement rules or regulations regarding the constitutional limits of that use, evidences a "deliberate indifference" to constitutional rights. Under such circumstances, a jury could, and should, find that Chew's injury was caused by the city's failure to engage in any oversight whatsoever of an important departmental practice involving the use of force." Chew, at 1445.

5.     The CPD K9 policy opens the gates of dog handler misuse and abuse by stating that CPD dogs may be utilized to apprehend *(aka: "bite")* _any_ suspect 1) evading arrest, 2) known to be armed, 3) has demonstrated violence, or 4) the potential for violence, or 5) has committed a felony offense. Ms. Singh did not fall within any of those five authorized K9 Unit biting provisions. Nevertheless, it should not be too surprising that the obvious consequence of a canine policy allowing that anyone *can* be bitten will result in anyone *will* be bitten. It will all add up to the discretion of a line-level dog handler rationalizing, during _any_ police contact, if _anyone_ deserves to be bitten and if _anyone_ does not.

6.     The CPD canine policy fails to offer important guidance to its officers and dog handlers pertaining to the basic considerations of felony/misdemeanor, adult/juvenile or active/passive resistance distinctions, not to mention the inherent differences of persons involved with the police during daily contacts. Competent police officers regularly weed through the people they encounter and usually have

little difficulty identifying who the suspects, subjects, victims, informants, witnesses, patients, prisoners and innocent third parties are. For the CPD dog handlers, it does not matter if _anyone_ gets bitten because it does not matter to their department. K9 Unit Officers, like Officer Sutton, can confidently release their "find & bite" attack-trained dog to bite _anyone_, with little fear that they will be held accountable.

N.      In his K9 Unit Policy, the Chief has failed to appreciate that it is a physical impossibility for a dog, even one of his trained dogs, to "apprehend" anyone. Unlike a human police officer performing a real apprehension *(aka: an arrest)* of a criminal suspect, a police dog is incapable of analyzing facts or circumstances or the corpus of a crime *(if there is one)* or understanding the concept of probable cause or reasonable suspicion or deciding when to make an arrest or notifying a suspect that he is under arrest or applying a firm grip or applying a control hold or performing a take-down maneuver or understanding the concept of escalation/de-escalation of force or applying handcuffs or conducting an investigation or interviewing the parties or collecting evidence or driving a police car or operating a radio or transporting arrested persons or seeking medical attention or booking prisoners into jail or writing the reports or filing the criminal charges or testifying in court. Of course, these are tasks normally performed by human police officers and are far beyond the capability of any police dog, no matter how well trained that police dog might be.

     1.      All the dog can do is inflict great bodily injury on a victim by biting. The point is this, casual references about CPD dogs "apprehending" suspects should not be confused with what is really happening. By biting, the CPD "find & bite" attack-trained dog is inflicting crushing, invasive, punctures and lacerations, potentially

subjecting the victim to death, if the resulting risk of hemorrhage, shock or foreseeable secondary infections are not effectively treated quickly by emergency medical professionals.

2.      As seen in the instant case, a "find & bite" attack-trained CPD dog was permitted to bite a suicidal woman suffering a serious bleeding emergency. The use of a department owned "apprehension" canine under the loose conditions of the CPD K9 Unit policy actually complicated the situation by allowing for the unnecessary placing of police officers and the general public, not to mention a frenzied victim experiencing the excruciating pain of the canine produced punctures and lacerations, to the unacceptable risk of suffering a collateral injury or death.

3.      Had there been an adequate canine policy in effect and affirmatively enforced on July 5, 2018, Officer Sutton would not have permitted his "find & bite" attack-trained dog to bite anyone, because to do so would have been in violation of his department's policy governing the conditions that would _permit_ an CPD dog to bite.  Conversely, Officer Sutton would also be cognizant of the conditions that would _prohibit_ a CPD dog from biting.  In sum, had there been an adequate and affirmatively enforced K9 Unit Policy, Ms. Sligh would not have been bitten, because to do so would have carried disciplinary consequences for Officer Sutton.

4.      The fact that the CPD condoned the actions of Officer Sutton has not changed their policy is tantamount to an unwritten policy of routinely tolerating the infliction of serious bodily injury via dog biting on any citizen unfortunate enough to cross paths with it.  As for the "find & bite" attack-trained dog, no officer from

the CPD ever said anything to Officer Sutton about poor tactics or took any action to prevent him from using his dog in a manner that would result in charges of using unreasonable, unnecessary or excessive force against a victim like Ms. Sligh.

5.      Under the circumstances of the instant case, the failure to get the "find & bite" attack-trained dog out of the way once Ms. Sligh was found, was the leading factor that caused a series of CPD policy violations. Not getting the "find & bite" attack-trained dog out of the way was unnecessarily dangerous to everyone present, including Montgomery County Sheriff's Office and EMT personnel.  Common sense should have prevailed on Officer Sutton. In their mutual-aid call, all MCSO was asking from Officer Sutton was to simply locate a suicidal woman experiencing a serious medical emergency that had fled into the nearby woods. Their request had nothing to do with the unreasonable, unnecessary and excessive force he permitted by releasing his "find & bite" attack-trained dog to repeatedly bite Ms. Sligh.

10.   I base my canine biting opinions upon the following:

A.      It is universally agreed among law enforcement agencies that when, in the course of a criminal investigation or apprehension, an officer releases a dog with knowledge that the dog may bite a person it finds, that is a use of force by the *officer*.  That is, the dog's actions in finding and biting someone will be evaluated under the use of force standards that apply to the officer had he himself used the degree of physical force the dog used. In other words, regardless of the instrumentality the officer elects to use (gun, dog, baton, mace, control hold, etc.), the same use of force rules should apply.

B.      As a use of force, the dog attack must be considered a high level of force, that is, force creating a substantial risk of causing a serious injury:

1.      When ordered to bite the dog is expected to bite hard with a *"full-mouth"* anywhere on the body – the *"bite and hold"* standard. The force in the dog's bite has been measured in excess of 600 PSI. Consequently, because of its training a police dog is far more likely to cause serious injury than an ordinary dog of comparable breed and size.

2.      The in-patient hospitalization rates for victims of police dog attacks are higher than any other police weapon (except for a gun). I have found hospitalization rates for victims of police dog attacks ranging from about 25% to nearly 50% of all persons bitten. Thus, a police dog attack is far more likely to cause serious injury than a police baton strike. (The in-patient hospitalization rate for persons struck by a police baton has been found to be no more than 5.8 percent of all persons struck.).

3.      Ms. Sligh suffered serious injuries from the dog bites. For reasons explained above, her injuries are *not* surprising. Rather, the injuries are reasonably foreseeable given the dog's "find & bite," "full-mouth bite," "bite & hold" and "bite until passive" training. Also, the federal Eleventh Circuit has recognized that police dog attacks are likely to cause serious injury. See *Kerr v. City of West Palm Beach,* 875 F.2d 1546, 1550 (11th Cir. 1989) (court of appeals finds "suspects often suffer serious injury" from police dog attacks).

C.      Under generally accepted law enforcement standards, force that creates a substantial risk of causing serious injury may not be used unless the suspect presents an immediate and credible threat of inflicting a serious injury. This is because Officer Sutton was not justified in simply walking up to Ms. Sligh and stabbing or mutilating her with a knife. Officer Sutton cannot avoid the use of force rules by saying, "Chief, the dog inflicted

the injuries to Ms. Sligh, not me!"

D.      Even if one were to disagree with the placing of a canine above a baton, at the top of the injuring force category, no reasonable view of the scenario described by any of the CPD or MCSO officers would allow for the use of the canine in the manner used here. This is because the method by which this canine was trained, the "find & bite," "bite & hold," "bite with a full mouth" and "bite until passive" method, will always create some level of injury, far out of proportion to what was required to control a suicidal woman experiencing a serious medical emergency, when, according to Officer Sutton, the dog was released with a command to bite (*Ref*: *Bodycam video starting at 12:33).*

E.      The entertaining myths of wonder dogs *(i.e. The "Magnificent Journeys" of "Rin Tin Tin," "Lassie" and "Benjie")* performing many wonderous acts of courageously confronting the adversities of life, are exactly that, entertaining myths. The fact of the matter is that police dogs are still just dogs. They cannot attain a higher status in life than their genes have already dictated.

1.      Dogs are amoral. They cannot think in abstracts like people can think in abstracts. They cannot analyze facts, exercise common sense or form judgments. They live only for the moment, seeking out pleasurable experiences and avoiding painful ones. Therefore, dogs cannot tell you who a good person is *(a "non-suspect"),* and should not be bitten, nor can they tell you who a bad person is *(a "suspect")* and should be bitten. That is always up to the human component of the handler dog team to make those critically important decisions.

2.      Nor can a police dog determine if his biting is in accordance with his department policies or with the law. A police dog cannot modulate the intensity of

his biting. He always bites as hard as he can. It is all the same to the dog. Given similar conditions as are found in most training scenarios, the dog will as readily bite "non-suspects," including children, the elderly and police officers or, for that matter, any other low level, non-violent and non-threatening suspects the same as they may bite the really dangerous "suspects" that they encounter during actual service.  Unfortunately, that is exactly what happened to Ms. Sligh after she was contacted by Officer Sutton. *(Ref. Bodycam video starting at approximately 12:33 through 13:36, 1 minute 3 seconds of sadistic biting.).*

F.      Proper police dog training is a slow daily methodical process of behavioral modification to turn the dog's inborn drives, instincts and character traits into qualities that demonstrate a benefit and not a detriment to those being served. In the instant case, it is the City of Conroe and its police officers. The training process requires patience and perseverance in the application of operant conditioning, where desirable behaviors are positively reinforced through appropriate rewarding *(i.e. vocal and/or physical praise, activity or food rewards).*  Undesirable behaviors are corrected and extinguished, mostly through the introduction of an element of pain *(i.e. vocal and/or physical correction, deprivation of activity or food rewards).* This especially includes those situations, in training *or* actual deployments, where the dog is expected to bite as a conclusion to his searching exercise *(Ref. The "Find & Bite," "Bite & Hold," "Bite with a Full Mouth" and "Bite Until Passive" K9 deployment doctrines.).* For example, Officer Sutton's dog has been trained to bite _anyone_ found at the conclusion of _any_ search. Allowing the dog to bite at the end of the track is in dog handler and trainer's parlance, a practice is known as "Hot-tracking," and was recorded by Officer Sutton in his Deployment Reports below:

1.      07/05/2018: Case #18070144, Suicidal female, in-view, bitten, 1 found.*

2.      07/01/2018: #1522776, Rolling stolen suspect on foot, 0 found.

3.      07/15/2018: #1516217, Vehicle evading, suspect on foot, 0 found.

4.      06/07/2018: #18060249, High-risk Stop, suspect on foot, 0 found.

5.      05/28/2018: #N/A, Suspect evading on foot, in-view arrest, 1 found.

6.      05/27/2018: #1508434, Vehicle Burglary J/O, suspect on foot, 0 found.

7.      05/15/2018: #18050609, Aggravated Robbery, suspect on foot, 0 found.

8.      05/05/2018: #1499830, Shooting suspects on foot, 1 of 2 in-view found.

9.       03/30/2018: #18031008, Business Burglary, suspect on foot, 0 found.

10.     02/09/2018: #18020307, Vehicle Pursuit, bailed, suspect on foot, 0 found.

11.     02/10/2018: #18020367, Vehicle Hit & Run, suspect on foot, 0 found.

12.     01/31/2018: #N/A, DPS Foot Pursuit, sunglasses found, 0 found.

13.     01/23/2018: #18010766, Vet Suicide, track into woods, 0 found.

14.     12/21/1017: #1448619, Residential Burglary, suspect on foot, 0 found.

15.     12/03/2017: #1442085, Suspicious person on foot, 0 found.

16.     11/22/2017: #17110811, Gun Disturbance, suspect on foot, 0 found.

17.     11/04/2017: #1711128, Welfare Check re Child, suspect in-view, 1 found.

18.     10/31/2017: #N/A, Mont. P.D. track re Stolen T/Trailer suspect, 0 found.

19.     10/08/2017: #17100279, Vehicle Accident, walk-away, in-view, 1 found.

20.     07/28/2017: #17070984, Moped evading, suspect on foot, 0 found.

21.     07/28/2017: #17070979, 3 dirt bikes evading, suspects in woods, 0 found.

22.     07/06/2017: # 17070175, Family violence suspect in woods, 0 found.

23.     05/24/2017: #N/A, Criminal Trespass suspects on foot, in-view, 2 found.

24.    05/15/2017: #1705???, S/Arm Robbery suspect on foot, wallet, 0 found.

25.    04/26/2017: #N/A, MCSO meth suspect flee on foot, 0 found.

26.    02/25/2017: #N/A, Huntsville PD stolen vehicle bail out, track, 0 found.

27.    02/07/2017: #17020273, Traffic violator bail out in woods, 0 found.

28.    12/27/2016: #16124679, Patrol/Evading on foot, in-view, 1 found.

29.    12/17/2016: #16123102, Suicidal male w/9mm in woods, 0 found.

30.    12/16/2016: #16122920, Vehicle Burglary suspect on foot, 0 found.

31.    12/12/2016: #16122167, Armed Robbery, 2 suspects on foot, 0 found.

32.    12/08/2016: #16121465, Malicious Mischief suspect on foot, 0 found.

G.    Unlike people, dogs cannot not draw distinctions between training scenarios or deployment scenarios. Significant to the above reported "hot-tracking" outcomes are that of the 32 hot-tracking incidents reported, 7 suspects of crimes and 1 non-criminal subject/patient *(Ms. Sligh)* were located "in-view" by perimeter or assisting personnel without incident. The dog had little to do with the finding, except that he was in the vicinity with his handler. The only person bitten at hot-tracking termination was Ms. Sligh, the non-criminal subject/patient.

1.    This is not surprising. Provide the handler/dog team a with 100 pleasurable training opportunities to find and bite the decoy while hot-tracking and the probable outcome on the 101st opportunity is that the dog will have a pleasurable time searching for and biting the decoy. All that is necessary is for the handler to release the dog at the termination of the exercise. It is the repetitive exercise that guarantees the sought for Pavlovian Response will be demonstrated by the dog.

2.    Essentially, the dog complies with his 1) handler's search command 2)

seeking out the pleasurable experience of biting, using his eyes, ears or nose to "find and bite" the decoy, 3) with a "full-mouth," 4) "holding" on, 5) "until the decoy becomes passive" before, 6) his handler issues the a "bite-release" command, 7) the dog complies, 8) opening his mouth, releasing the decoy, to end the exercise.

3.       As seen in the instant case, the "down-side" of this "find & bite" scenario happens when the recipient of the biting is not a criminal suspect.

H.       Objectively, given enough quality K9 training for enough time to establish the desired behaviors *(and/or extinguish the undesirable behaviors),* should optimally produce the desired "Pavlovian" responses. But training dogs to bite people, as mentioned above, does not go without the inherent risks of experiencing the unintended outcomes. Consider for example, the teaching CPD dogs to bite people without any responsible instruction about the implications of usage. Between June 6, 2017 and November 13, 2018, Officer Sutton provided 220 pages of K9 training exercises with his dog. The record is replete with references to finding and biting and biting and releasing passive hidden decoys, but silent with respect to any instruction about the legal, moral and ethical implications of using the dog as a weapon. Because the handler-produced training record is silent on these important points, I conclude that the Sutton/Thor dog team did not receive the important training to prepare them for the July 5, 2018 MCSO incident. Dogs do not possess the cognitive capacity to know what to do or how far to go in any situation otherwise. That knowing is perhaps their handler's greatest responsibility to their department and the community they serve.

I.       Yet Officer Sutton cavalierly approached and released his dog, without an adequate warning, to bite Ms. Sligh's left calf, while she was about to be handcuffed by Deputy

Montes. Because a police dog bite is force greater than a police baton strike and was force reasonably capable of causing serious bodily injury, the dog attack and biting violated generally accepted law enforcement *use of force* standards as an unwarranted escalation of force in the form of a handler-ordered, dog biting. See the below bodycam footage by Officer Sutton for details.

1.    00:01, On-leash area search commences, Sutton scans with flashlight.

2.    06:36, 06:49 & 06:59, Dog lifts leg w/o handler correction.

3.    07:49, Dog commanded to "Leave it!"

4.    08:50, Dog corrected "Fooey! Platz!"

5.    09:39, Dog alerts at fence.

6.    10:16, Dog lunges and barks at bushes in front of Ms. Sligh.

7.    10:54, Sutton observes Ms. Sligh, "She's taking off!"

8.    11:59, Sutton, "Do not walk towards me! Do not walk towards me!"

9.    12:05, Dog pulling. Sutton, "The dog's going to bite you! Back up!"

10.    12:10, Ms. Sligh in view. Barefoot, shorts, tank-top, nothing in hands.

11.    12:14, Ms. Sligh talks to Montes, struggles to break grip, _no_ face strikes.

12.    12:30, Montes breaks contact with Ms. Sligh and gets out of way.

12.    12:33, Dog bites, Ms. Sligh screaming. Sutton, "Get on the ground!

13.    12:40, Get on the ground! Now!

14.    12:44, 12:47, 12:52, 12:57, 13:01, Dog non-compliant to bite release.

15.    13:19, Ms. Sligh, "Get this dog off me!"

16.    13:36, Apparent handler's intervention, 1:03 minute biting stops.

J.    A police dog does not know, and cannot be taught, any of the take-down maneuvers,

control holds, or defensive blocks that a police officer learns as part of his self-defense training. A police dog cannot be taught or execute a control hold, foot sweep, arm-bar, wrist lock, etc. All that a police dog can do is to attack and bite in the same manner of any aggressive dog. As already mentioned, because dogs do not have hands, it is not possible for a dog to grab anyone either. It is impossible for them to make an arrest or apply handcuffs. In this respect, Officer Sutton's dog is no different than any large aggressive dog hunting for and attacking its prey, be it human or animal.

K.      Dogs are not good weapons. They cannot be effectively aimed like other weapons (*i.e. gun, baton, taser, mace, etc*.). Dogs are easily distracted. They are prone to act spontaneously and independently of their handlers. They cannot analyze facts or exercise common sense or good judgment like people can. Under certain conditions, they will as readily bite their handler or other innocent persons without provocation. According to the generally accepted K9 policies of those U.S. police agencies that have K9 Units, supervising the dog is the handler's greatest responsibility. But as is present in the instant case, it should not be surprising that tragic consequences can occur when police dogs are improperly trained, irresponsibly handled and inadequately supervised.

L.      The natural reaction of a person when attacked by a dog is to try to fend off the dog's attack. This usually takes the form of kicking and/or striking the dog, sometimes even running away from the dog, if that is physically possible. If the person is armed with a gun or knife, he will likely have a reason to use those weapons against the dog, if only to stop the attack. By letting his dog bite, Officer Sutton increased the risk of a shooting and endangered others nearby to the consequences of errant gunfire, be it from Ms. Sligh or other officers. For this reason, provoking a suspect to action is <u>never</u> a desirable outcome

to a police K9 operation.

M.    With the presence of multiple bites on Ms. Sligh's right thigh, there is good physical evidence to opine that the dog was not biting in conformance with his "full mouth" and "bite & hold" training, rather being permitted to maximize the infliction of pain and injuries by biting repeatedly. Officer Sutton compounds the severity of the injuries when 1) he is unable to secure a verbal bite release five times *(Ref. Bodycam at 12:44, 12:47, 12:52, 12:57 and 13:01)* by the dog and 2) when the dog bit Ms. Sligh's left ankle. I also note from the bodycam video Ms. Sligh's painful screams, compelling evidence to support of my opinion that she was not the aggressor on July 5, 2018.

N.    Hundreds, if not thousands of times every day, U.S. police officers without dogs are skillfully arresting dangerous suspects without injury to anyone. When an officer confronts a potentially combative person, the officer's primary objective is to induce the person into a passive and non-threatening posture. Officers accomplish this through self-defense tactics and calm, but skillful verbal persuasion. For reasons already explained above, a dog is incapable of performing such tactics and certainly cannot offer skillful verbal persuasion. Worse, by attacking and biting, the dog encourages the opposite of what an officer wants. The person under attack responds in some violent and usually uncoordinated manner, flailing to stop the dog's attack which in turn, encourages the dog to press its attack more violently.

O.    Additional problems arise given the dog's inability to recognize danger and a man's willingness to use a weapon, if he has one, against the dog. Unlike a gun or baton, a dog cannot be aimed or pointed. An officer who realizes he must stop the suspect from raising his right hand that holds a weapon knows to strike at the right hand.  In the same situation,

the dog is incapable of making such a distinction. The trained police dog ordered to bite will bite the suspect's left arm he offers the dog even though the suspect may hold in his right hand an ice pick or knife ready to plunge into the dog's skull when it bites. This is the main why the German Customs Police stopped training their dogs to attack and bite but instead, trained the dogs to circle and bark *(Ref. Material J. International Association of Chiefs of Police (IACP) Law Enforcement Policy Center:* Patrol Canines, *a Concepts and Issues Paper, Originally Published: May 1992, Revised: September 2001, May 2015, (15 pages) re: police dogs as a use of force.) (Ref. Material K. IACP Model Policy:* Patrol Canines, *Effective Date: May 2015, (5 pages) re: recommendations for police dogs to "find & bark.).* The German police lost too many dogs to suspects who let the dogs bite one arm protected by padding while the suspects used their other free arm to stab the dogs to death. Mention is made of this fact only because German Police Dog professionals, respected internationally as the premiere K9 model, recognized as far back as post WWII that it was safer to have their dogs bark rather than bite, because once the person being sought by the police was located, the handler/dog team's mission was accomplished.

P.      The release of his dog to bite Ms. Sligh drew Officer Sutton into a close-quarters confrontation with a subject who was extremely agitated *(frantic)* because she was being bitten by "find & bite" attack-trained dog. A better outcome could have been realized by Officer Sutton and Deputy Montes if they had done what police officers normally do in similar circumstances, used their policing skills to calm Ms. Sligh and waited a few precious seconds for her cooperation. Police officers understand that most persons comply with their directions. Ms. Sligh could have been moved to safety in the same manner as when police officers without dogs regularly do, minimizing, if not eliminating the risk of

injury or death to anyone.

Q.     Officer Sutton failed to appreciate his police training and the four "bright-line" rules governing the use of force in U.S. law enforcement, I have recapped below:

    1.     The objective in the use of force <u>must be to achieve control</u> of a person or a situation.

    2.     Any use of force <u>must be reasonable</u>.

    3.     Any use of force <u>must be in direct response to an immediate and credible threat</u> *(of sustaining a serious injury or death).*

    4.     Any force used <u>must comport with department policy and with the law</u>.

R.     In the interest of promoting better guidance in K9 usage, it is my opinion that the CPD would benefit by adopting "Rules of Engagement" that would clearly define the acceptable conditions that must be present to <u>permit</u> one of their dogs to bite. For example, a viable "limited bite" policy statement would go as follows: "Outside of sanctioned training, CPD dogs are <u>permitted</u> to bite suspects when the officer is responding to an immediate and a credible threat of serious injury or death to himself or another."

S.     The CPD would benefit by adopting "Rules of Engagement" that would define the conditions where their dogs are <u>prohibited</u> from biting. For example, a viable policy statement would go as follows: "Other than responding to conditions that would permit department dogs to bite, CPD dogs are <u>not</u> permitted to bite:

    1.     Juvenile subjects, identified persons, located persons, warrant suspects, non-violent felony, misdemeanor or infraction suspects and innocent 3rd parties *(aka: non-suspects).*

2.      Mentally impaired persons due to their illness, injury *or* expressions of suicidal ideation.

3.      Persons impaired because they are under the influence or the combined influence of illicit drugs, prescription drugs and/or alcohol.

5.      Non-suspect others or police officers, except when acting in an authorized K9 training capacity.

6.      CPD handlers are responsible for their dog's actions, on and off duty.

a.      Accidental biting by a CPD dog is unacceptable and will be fully investigated, the same as a parallel investigation would into an accidental discharge of a department firearm.

b.      Upon the first accidental bite, handlers will be removed from service, retrained and re-certified as service-worthy by a qualified, independent police dog trainer. Resuming K9 service will then be at the direction of the Chief of Police.

c.      Upon a second accidental bite, the handler/dog team will be removed from K9 service pending the directions, decisions or dispositions given by the Chief of Police.

d.      Any subsequent accidental biting will disqualify the handler/dog team from continued K9 service. Immediate measures will be implemented to replace the disqualified handler/dog team with a trained and certified service-worthy handler/dog team.

e.      Dogs removed from service will not to be returned to the K9 source or vendor. Those dogs will be designated as "retired K9" and kept for other-

than-police activities with their handlers or placed in an approved home with capable owners.

      f.     Additional service-worthy handler/dog teams will be authorized inclusion with the K9 Unit at the discretion of the Chief of Police."

T.     In most states, the use of force standards and rules of engagement for law enforcement are constructed around a use of force continuum. For example, in California, POST taught the conventional use of force for police officers in terms of a force continuum under Unit Guide 26, circa 1991.  The benefit of using a force continuum is that it further clarifies an officer's Rules of Engagement when dealing with resistant suspects. My experience teaching this subject extends from the Los Angeles County Sheriff's Department in 1972 as a Field Training Officer, 1974 as an Academy Drill Instructor, 1978 as a SWAT Team Precision Marksman and as a Special Programs Manager for the Administrative Division (1974-1975), East Patrol Division (1975-1978), Custody Division (1979-1980), SEB K9, East Patrol Division (1980-1988). Since 1988, I have 32 years of teaching police K9 technology, arrests, the use of force and firearms in academic settings and academy classes *(Ref. CA POST Arrest and Firearms 832 P.C. training courses)*.

U.     It is widely held in American law enforcement that a police officer will only be as good as his training can make him. Accordingly, to make the use of force subject easy to understand, "force continuums" were promulgated to provide timely guidance to an officer so he could quickly identify an appropriate response to an immediate and credible threat posed by a resisting suspect. In the interest of promoting improved responses to physically resisting suspects, I have included a description of a viable generic force continuum *(aka: "A Ladder of Force" or "A Barometer of Force"),* divided between the suspect's resisting

actions and the officer's force option responses.

1.      The use of force in law enforcement is a responsive/reactive event. The responses by officers are based in the level of resistance a suspect demonstrates the moment physical force is necessary to achieve control of the situation.

2.      Force continuums are injury driven. What this means is that, within the hierarchy of available force options, the tools or techniques posing greater probabilities of injuries, up to and including death, are ranked higher on the scale.

3.      Generally, an officer is justified when escalating to and using "force-in-kind" against resisting suspects and not more. To use more force than can be justified, likely results in the officer using excessive force.

    a.      Each situation is evaluated according to the circumstances facing the officer the moment any use of force becomes necessary. That information is gleaned from the officer's report, reflecting the "responsive link" between the threat posed, the level of resistance demonstrated by the suspect's actions and the officer's response to those actions.

    b.      The response by the officer will be analyzed in the context of 1) the level of force the officer escalates to, 2) the intensity of the force application and 3) the duration of the force application.

4.      The use of force by law enforcement preemptively or as a retaliatory measure is not generally accepted by citizens, an employing agency or the courts. Therefore, absent a clear link between the suspect's offensive actions and the officer's defensive reactions, the intentional infliction of injury for any reason whatsoever, including for the for the sake of securing pain compliance, is

unacceptable and, as a matter of policy, prohibited.

5.      The use of physical force for the purpose of inflicting pain or punishment only is specifically prohibited by state, federal and professional standards. Only the courts are entitled to impose punishment. Police or other persons are not entitled to inflict punishment out of anger, loss of emotional control or for retribution. To do so may be a crime *(i.e. a Civil Rights Violation for an Assault Under the Color of Authority, etc.)* potentially carrying internal discipline and/or criminal penalties.

6.      Force continuums are generally divided into three broad categories governing the use of physical force. In ascending order, they are "Controlling Force," "Injuring Force," and "Deadly Force."  Each provides guidance as to the level of force that can be justified by an officer in response to a suspect's actions, including the expected injuries each force option potentially produces.  An example of a viable Force Continuum is as follows:

| SUSPECT'S ACTIONS | OFFICER'S ACTIONS | | BASIC OBJECTIVE |
|---|---|---|---|
| Life Threatening Attack | Deadly Force | DF | Stop, Produce Death/ |
| | | DF | Serious Bodily Injury |
| | K9 Dog Biting | IF/DF | Stop, Will Produce |
| | | IF/DF | Serious Bodily Injury |
| | Choke Holds | IF/DF | Stop, Incapacitation |
| | (Check your Policy!) | IF/DF | High Risk of Death |
| Physical Assault | Impact Weaponry | IF | Stop, Incapacitation, |
| | | IF | May Produce SBI |
| | Martial Arts Techniques | IF | Stop, Incapacitation, |
| | | IF | May Produce SBI |
| Active Resistance | Electronic Devices | IF | Stop by Shock - Stun |
| | | IF | May Produce Injuries |
| | Chemical Agents | IF | Stop-Irritate/Disorient |
| | | IF | May Produce Injuries |
| Passive Resistance | Pain Compliance | IF | Physical Compliance, |
| | | IF | Injuries not Expected |
| | Control Holds | CF | Body Control, Risk of |
| | | CF | Injury Minimal |

| | Firm Grip/Hands-on | CF | Physical Control, by |
|---|---|---|---|
| | (First Level Reportable) | CF | Directing or Ordering, |
| | | CF | Injuries are Unlikely |
| Cooperation | Verbalization | CF | Controlling Others via |
| | | CF | Persuasion, |
| | | CF | Injuries are Unlikely |
| Presence | In-view | CF | Influence Behavior |
| | | CF | of Others, |
| | | CF | Injuries are Unlikely |

V.      In selecting his force options, once Ms. Sligh was found, Officer Sutton did not consider the standard three-part test as given in *Graham v. Connor*, 490 U.S. 386 (1989). Specifically, he did not consider the overall analysis of the use of force requires an examination of the severity of the offense the officer encountered at the time the force was used, 1) the level of threat the suspect posed to the officer or another, 2) the level of resistance offered up by the suspect and 3) any attempt by the suspect to evade arrest by flight.

W.      The instant case fails in all respects to Graham. Ms. Sligh was *not* suspected of a crime when first observed by Officer Sutton. A review of his bodycam at 12:14 through 12:33 of the incident does not support his assertion that Ms. Sligh struck Deputy Montes in the face multiple times with her closed fists. However, Officer Sutton initiated the biting by releasing his dog on Ms. Sligh's right thigh. Ms. Sligh's reported resistance, such as it was, was slight and defensive in nature from Deputy Montes initially grabbing her arm while the dog lunged and barked nearby. She did not attempt to evade arrest by flight – mostly because it was not physically possible given that she "crumbled" to the ground when bitten by Officer Sutton's "find & bite" attack-trained dog.

X.      When considering the Graham factors, where the suspect *(Ms. Sligh was not a suspect.)* poses only a remote and theoretical threat to officer safety and where the officers

have not attempted to properly arrest or take that person into custody, it is my opinion that it is objectively unreasonable to inflict serious bodily injury when ordering a police dog to bite to merely subdue that suspect. Thus, failing the Graham three-part test, I conclude that Officer Sutton's infliction of serious bodily injury in the form of releasing his "find & bite" attack-trained dog to bite Ms. Sligh twice was objectively unreasonable and excessive force in gross violation of the 4th Amendment.

11.    My supplemental opinions are:

A.    An additional review of the CPD policies reinforces my opinions expressed earlier in my report that the infliction of serious bodily injury in the form of dog biting was objectively unreasonable and excessive force in clear violation of not only the above mentioned CPD policies, but generally accepted national standards in law enforcement governing the use of physical force.

B.    In review of the already mentioned CPD policies, I have also considered the International Association of Chiefs of Police (IACP) Law Enforcement Policy Center: Patrol Canines, a Concepts and Issues Paper (Material J.) the IACP Model Policy: Patrol Canines (Material K.), the Police Executive Research Forum (PERF), Critical Issues on Policing Series: Guiding Principles on Use of Force (Material L.) and the National Consensus Policy and Discussion Paper on the Use of Force (Material M.).  Consistent with my opinions expressed in my report, I rely on these model policy statements on the use of force and canine operations. They contain guidance by respected authorities on pertinent standards of conduct and best practices for law enforcement. The general thrust of materials J, K, L, and M encourages field officers to use prudent tactics of "de-escalation" as the preferred method to handle uncooperative persons they encounter. Based

upon my reliance on these model policy guidelines, I provided specific discussion in my report: "When an officer confronts a potentially combative person, the officer's primary objective is to induce the person into a passive and non-threatening posture. Officers accomplish this through basic self-defense tactics *(i.e. containing, maneuvering, isolating and the use of other proven control holds on resisting suspects, etc.)* and calm, but skillful verbal persuasion.

C.      For reasons already explained, a dog is incapable of such tactics and cannot de-escalate the situation through skillful verbal persuasion. Worse, by attacking and biting, the dog encourages the opposite of what the officer wants. The person under attack typically responds in some violent and usually uncoordinated manner to fend off the dog's attack which in turn stimulates the dog to press its attack more violently.

D.      Officer Sutton's rational to assist Deputy Montes through the release of his dog to bite Ms. Sligh did *not* de-escalate the situation. Allowing the dog to bite a person whom you want to restrain is like throwing gasoline to prevent the fire. Because a dog is incapable of exerting a control hold or apply handcuffs, the dog by biting escalates the violence and complicates the situation. The dog's handler is forced to deal now with two potential dangerous subjects, 1) the person who is being encouraged by the dog's attack to react violently and 2) the dog which, because it is biting, is more difficult to control and consequently more likely to bite an assisting officer. Deputy Montes is lucky he was not bitten during the action.

E.      All officer-safety considerations in the presence of potentially dangerous persons quickly evaporate once the "find & bite" attack-trained dog is released to bite. If a suspect is really armed, the attacking dog becomes the reason that the suspect will be motivated to

use his weapon if only to defend himself from what he perceives to be a life-threatening attack by a vicious animal. As mentioned earlier in this report, police officers similarly positioned do not hesitate to shoot and kill large aggressive dogs that threaten them. Generally, those shootings are upheld as justifiable by their departments too.

F.      Two officers should have been enough to control Ms. Sligh and could have done what the dog was incapable of doing by articulating their intent to apply handcuffs, positioning Ms. Sligh's arms behind her back and applying the handcuffs for safe transportation. Any further escalation of force would have depended upon Ms. Sligh's actions once the officers moved her hands behind her back – but not before.

G.      It is <u>always</u> the responsibility of the human police officer to make the decisions the dog is incapable of making. As was seen in the instant case, Deputy Montes applied the handcuffs, not the dog. In the final analysis, the presence of the CPD "find & bite" attack-trained dog did not contribute to the safety to anyone. All the dog could do under the circumstances was obey Officer Sutton's attack command and mutilate Ms. Sligh's right thigh and left ankle.

/

/

/

/

/

/

/

/

In the matter of Olivia Danielle SLIGH v. CITY OF CONROE PD, et al., Civil Action 4:20-cv-1417 (Jury Trial), I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct. Executed, July 29, 2020, at Grass Valley, Nevada County, California.


_____

Van Ness H. Bogardus, III.